|  |  |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |
| ------------------------------------------------------X : | |
| In re: : | Chapter 11 |
| : | |
| FRANK'S NURSERY & CRAFTS, INC., : | Case No.: 04-15826 (PCB) |
| : | |
| Debtor. : | |
| : | |
| ------------------------------------------------------X | |

**MEMORANDUM DECISION DENYING DEBTOR'S
MOTION TO DISALLOW CERTAIN AMOUNTS ASSERTED
AS PART OF SECURED CLAIM OF THE J.E. ROBERT COMPANY, INC.**

**A P P E A R A N C E S:**

PROSKAUER ROSE LLP
Attorneys for Reorganized Debtors
1585 Broadway
New York, New York 10036

    Alan Hyman, Esq.
    Jeffrey W. Levitan, Esq.
       Of Counsel


LAW OFFICES OF CHRISTOPHER E. CHANG
Attorneys for J.E. Robert Company, Inc.
140 Broadway
46th Floor
New York, New York 10005

    Christopher E. Chang, Esq.
       Of Counsel


VENABLE LLP
Attorneys for J.E. Robert Company, Inc.
1800 Mercantile Bank & Trust Building
Two Hopkins Plaza
Baltimore, Maryland 21201

    Gregory A. Cross, Esq.
    Heather Deans Foley, Esq.
       Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

Frank's Nursery & Crafts, Inc. (the "Debtor") has moved to disallow $158,626.53 asserted as part of the secured claim of the J.E. Robert Company, Inc. ("JER"). The disputed portion was the subject of a compromise that was approved under a confirmed plan in an earlier bankruptcy. The objection constitutes a collateral attack on the earlier plan, and the claim objection is overruled for the reasons that follow.

## BACKGROUND

**A.    Original Frank's Nursery & Crafts**

The facts are undisputed. Between January 26, 1996 and March 1996, a Michigan corporation formerly known as Frank's Nursery & Crafts, Inc. ("Original Franks") executed five promissory notes (the "Notes") in favor of its original lender in the aggregate approximate amount of $5.2 million (the "Loan"). Each Note was secured by a mortgage on a parcel of real property (collectively, the "Mortgages"), and the five Notes and the corresponding Mortgages were cross-defaulted and cross-collateralized.[1] FNC Holdings, Inc. guaranteed the Notes.

The "Applicable Interest Rate" under each Note was 9.28% per annum. (JER Response, at Ex. A, ¶ 1.) In the event of a default, the borrower was required to pay the "Default Rate" of interest on the unpaid principal balance. (Id., at ¶ 20.) The Default Rate was the greater of 4% above the Applicable Interest Rate or 4% above the Prime Rate in effect at the time of the

---

[1] Representative copies of the Note and Mortgage are attached, respectively, as Exhibits A and B to the Response To Reorganized Debtor's Objection Seeking To Disallow Certain Amounts Asserted As Part Of The Secured Claim Of J.E. Robert Company, Inc., As Special Servicer On Behalf Of LaSalle National Bank Association, As Trustee For The Registered Holders Of Commercial Mortgage Pass-Through Certificates 1996-C2, dated Nov. 11, 2005 ("JER Response") (ECF Doc. # 1394). According to JER, the relevant terms of each Note and Mortgage are identical. (See JER Response, at 3 n.1.)

2

default. (Id., at ¶ 7.) Finally, if the lender employed an attorney to collect the debt, enforce the Note or protect or foreclose the Mortgage, the borrower agreed to pay the lender's attorney's fees and disbursements. (Id., at ¶ 8.) The Loans were subsequently assigned to LaSalle Bank National Association, as Trustee for the Registered Holders of Commercial Mortgage Pass Through Certificates Series 1996-C2. JER acts as Special Servicer of the Loans on behalf of LaSalle.

On February 19, 2001, Original Franks and FNC Holdings, Inc. (collectively, the "Maryland Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland. The Maryland Debtors eventually proposed a plan, and several entities, including JER, filed objections. JER's objection was resolved, and JER became one of the "Settling Mortgagees" under the Second Amended Plan of Reorganization, dated May 7, 2002 (the "Maryland Plan")[2], which defined "Settling Mortgagees" as

> those Mortgagees with whom the Debtors have entered into settlements regarding treatment of their Mortgagee Claims under the Plan, in exchange for which such Settling Mortgagees have agreed to withdraw their respective objections to the Plan and to have their Claims deemed to have been voted in favor of the Plan.

(Maryland Plan, at ¶ 1.66.)

The settlement was embodied in a term sheet attached as Schedule 3.03(k)-3 to the Maryland Plan (the "Term Sheet"). (JER Response, Ex. E.) The parties agreed to recapitalize the Notes, increasing the unpaid balance by the amount of accrued pendency interest,[3] computed

---

[2] The parties provided the Court with a copy of the Maryland Plan.

[3] In this opinion, "pendency interest" refers to the interest that accrued between the petition date and the confirmation date.

3

at the non-default rate, and certain attorney's fees. JER also unconditionally waived, inter alia, 50% of the default rate interest. Finally, and of importance to the Debtor's current objection, JER waived the remaining 50% of the default interest and the balance of its unpaid attorney's fees and out-of-pocket costs that were incurred prior to the effective date, provided that a default did not occur before full payment. The Term Sheet identified three events of Default:

> For the purposes of the immediately preceding settlement term only, "Default" shall refer to any of the following events: (a) the date of sale, pursuant to a docketed foreclosure proceeding commenced by Mortgagee or their successors of any property secured by the New Note (and Mortgagee may include this debt in its bid price and/or calculation of debt at sale); (b) the commencement of a voluntary case by the Debtors under any chapter of the Bankruptcy Code; or (c) failure to make any payment owed pursuant to the amended loan documents.[4]

(Emphasis added.)

The Maryland Plan was confirmed on May 7, 2002. (See Order Confirming [Maryland] Debtors' Second Amended Joint Plan of Reorganization, dated May 7, 2002) ("Maryland Confirmation Order.") (JER Response, Ex. D.) Pursuant to the Maryland Plan, the Maryland Debtors merged into a reorganized and reincorporated entity -- the instant Debtor. After the merger, all of the assets and liabilities of the Maryland Debtors became assets and liabilities of the Debtor.

B.      **The Modification Agreements**

Following the May 20, 2002 effective date of the Maryland Plan, the Debtor and JER memorialized the provisions of Term Sheet with a more formal agreement. In October 2000, the

---

[4]    The Maryland Debtors were given one year after receipt of written notice to cure the Default based on non-payment.

4

parties entered into five separate but substantially identical Modification and Confirmation Agreements (each, a "Modification Agreement," and collectively with the Notes and Mortgages, the "Loan Documents"), effective as of May 20, 2002. (<u>JER Response</u>, Ex. F.) Paragraph 3.3 (c) of the Modification Agreements incorporated the waiver provision in the Term Sheet, but with some variations in language.[5] The amounts waived were called "Deferred Indebtedness." In addition, the Modification Agreements dropped the term "Default" and substituted the phrase "Triggering Event." Bankruptcy was not a Triggering Event, but the Modification Agreements nonetheless provided that JER could collect the Deferred Indebtedness if the Debtor filed a voluntary bankruptcy petition:

---

[5]  Paragraph 3.3 (c) of the Modification Agreement provides:

3.3(c). <u>Deferred Indebtedness</u>. The following is hereby inserted as a new Paragraph 7.A immediately following the existing paragraph 7:

7.A. <u>Deferred Indebtedness</u>. [JER] hereby waives all rights to exercise its remedies under the Note, Mortgage and Other Security Documents by reason of non-payment of (a) fifty percent (50%) of interest that had accrued under the Note at the Default Rate . . . and (b) except as set forth below, any and all other late charges, fees, penalties and premiums accrued under the Note prior to May 7, 2002. So long as no Triggering Event (as hereinafter defined) has occurred, upon payment in full of all amounts owed under [the Loan Documents], [JER] will waive its right to collect (i) the remaining fifty percent (50%) of interest that had accrued under to this Note [sic] . . . and (ii) that portion of [JER's] attorneys' fees and out-of-pocket expenses due under this Note as modified by that certain Modification and Confirmation Agreement . . . May 20, 2002 (the sum of the amounts described in (i) and (ii) is hereinafter referred to as the "<u>Deferred Indebtedness</u>"). "<u>Triggering Event</u>" as used herein means either (x) the date of a sale of any property securing this Note pursuant to a docketed foreclosure proceeding commenced by [JER] . . . or (y) the failure to make any payment when due under [the Loan Documents] and the continuation of such failure for a period of one (1) year from the date [the Debtor] receives [JER's] written non-payment notice.

[The Debtor] acknowledges and agrees as follows with respect to the Deferred Indebtedness:

(a) The Deferred Indebtedness may be included by Lender . . . in the bid price at a sale of any property securing this Note pursuant to a docketed foreclosure proceeding commenced by lender or its successors or assigns.

(b) The Deferred Indebtedness may be included by Lender . . . in the allowed claim in connection with any voluntary case by Borrower under any chapter of the Bankruptcy Code or entry of any order for relief against Borrower under any chapter of the Bankruptcy Code . . . .

The provisions hereof regarding the Deferred Indebtedness shall not impair or prohibit [JER] . . . from exercising all other rights and remedies available under [the Loan Documents] or at law upon the occurrence of a default or an Event of Default, including without limitation, such rights that may arise during the one (1) year period described above.

5

> [The Debtor] acknowledges and agrees as follows with respect to the Deferred Indebtedness:
>
> . . . .
>
> (b) The Deferred Indebtedness may be included by Lender . . . in the allowed claim in connection with any voluntary case by Borrower under any chapter of the Bankruptcy Code or entry of any order for relief against Borrower under any chapter of the Bankruptcy Code . . . .

**C.     The Instant Bankruptcy Case**

The Debtor filed the instant chapter 11 case on September 8, 2004, and stopped making the Mortgage payments.  Thereafter, the Debtor concluded that JER was oversecured, and made up the missed payments.  (<u>Reorganized Debtor's Objection Seeking to Disallow Certain Amounts Asserted as Part of the Secured Claim of J.E. Robert Company, Inc. as Special Servicer on Behalf of LaSalle National Bank Association, as Trustee for the Registered Holders of Commercial Mortgage Pass-Through Certificates 1996-C2</u>, dated Oct. 18, 2005, at ¶ 8) ("<u>Debtor's Objection</u>") (ECF Doc. # 1392.)  JER filed a secured claim in the aggregate amount of approximately $5 million, plus all accrued interest, default interest and other fees.[6]  The claim included the Deferred Indebtedness in the amount of $158,626.53.

On June 15, 2005, the Court confirmed the Debtor's Second Amended Plan of Reorganization (the "Plan").  Pursuant to the terms of the Plan, general secured claims, which included JER, were placed in Class 3.  The Class 3 secured claims either (i) retained their lien and were reinstated and rendered unimpaired in accordance with Bankruptcy Code § 1124(2); or (ii) received cash in an amount equal to the secured claim, including interest paid pursuant to Bankruptcy Code § 506(b).

---

[6]     A copy of JER's claim is attached as Exhibit A to the <u>Debtor's Objection</u>.

6

The Debtor subsequently filed this post-confirmation objection to the portion of JER's claim that corresponds to the Deferred Indebtedness. It argues that the Deferred Indebtedness is not enforceable or allowable because it is: (1) not due under the terms of the Loan Documents, (2) an unenforceable penalty, (3) an unenforceable acceleration clause under 11 U.S.C. § 1124(2), and (4) an unenforceable ipso facto clause under 11 U.S.C. § 541(c)(1)(b).

## DISCUSSION

A confirmed plan binds the debtor and its creditors, 11 U.S.C. § 1141 (a), and cannot be modified after it has been substantially consummated. 11 U.S.C. § 1127 (b). If the debtor confirms a chapter 11 plan and thereafter files a second chapter 11 case, "it is impermissible to use such filings to alter or modify obligations which were created and assumed through a substantially consummated prior plan of reorganization, except in the most extraordinary of circumstances." In re Northtown Realty Co., L.P., 215 B.R. 906, 911 (Bankr. E.D.N.Y. 1998). Moreover, a confirmed plan constitutes a final judgment on the merits and will be given preclusive effect if the other elements of res judicata are present. See Corbett v. MacDonald Moving Services, Inc., 124 F.3d 82, 87-88 (2d Cir. 1997); Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 872-73 (2d Cir. 1991); Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Securities Corp., 00 Civ. 8688 (WHP), 2004 WL 1119652 * 2 (S.D.N.Y. May 20, 2004).

In the first bankruptcy, JER was apparently fully secured because the Maryland Plan provided for payment of the pendency interest at the non-default rate and a certain amount of attorney's fees. Under 11 U.S.C. § 506(b), a fully secured creditor is entitled to collect interest

7

on its claim in addition to reasonable fees, costs or charges provided for under the parties' agreement. As noted, the Notes allowed JER to collect default rate interest in the event of a default, and attorney's fees and disbursements incurred in collecting the debt, enforcing the Notes, or protecting the collateral. If the Maryland Debtors had proposed a plan that impaired JER's contractual rights without JER's consent, they would have had to cram the plan down over JER's objection. In that circumstance, JER would have been entitled, <u>inter alia</u>, to retain its liens and receive deferred cash payments equal to the present value, as of the effective date, of its allowed secured claim. <u>See</u> 11 U.S.C. § 1129(b)(2)(A).

The parties have not provided an earlier version of the Maryland Debtors' plan, but something in it caused JER to object. Nor have they explained the reason for the objection. However, the settlement implies that the dispute related to the allowance and payment of interest at the Default Rate. The law in this area is murky. On the one hand, § 506(b) allows the bankruptcy court to decline to award an unreasonable contractual default interest rate. <u>See</u> <u>In re Consolidated Prop. Ltd. P'ship</u>, 152 B.R. 452, 456 (Bankr. D. Md. 1993). On the other hand, a plan that cures a mortgage default and de-accelerates the mortgage impairs the mortgagee's secured claim if it fails to provide for the payment of interest at the contractual default rate. <u>See</u> <u>In re 139-141 Owners Corp.</u>, 306 B.R. 763, 769-71 (Bankr. S.D.N.Y.), <u>aff'd</u>, 313 B.R. 364 (S.D.N.Y. 2004).

It is not important, for present purposes, to know why JER objected to the Maryland Debtors' plan. It is, however, important that the parties resolved the objection, and the Maryland Debtors secured JER's accepting vote by stipulating to the treatment of JER's secured claim.

Among other things, JER agreed to conditionally waive part of its claim – 50% of the default interest in addition to some attorneys' fees and expenses -- and the Maryland Debtors agreed that JER could collect the waived amounts if, among other contingencies, the Maryland Debtors filed another voluntary bankruptcy petition before they repaid the loan. The treatment of JER's claim was incorporated into the Maryland Plan, and JER withdrew its objection and voted to accept the plan as part of the deal. The Maryland bankruptcy court reviewed and expressly approved the parties' compromise as "embodied in the [Maryland] Plan and this [Confirmation] Order," finding that it was fair and reasonable, satisfied FED. R. BANKR. P. 9019, and was consistent with "section 1126 (a) (6) of the Bankruptcy Code."[7] (Maryland Confirmation Order, at ¶ HH.) The treatment was thereafter embodied in the Modification Agreements without material change.

The Debtor now objects to the bargained-for treatment of JER's claim in this proceeding. The treatment under the Term Sheet, subsequently memorialized in the Modification Agreements, is plain and unambiguous.[8] JER retained the right to collect the "Deferred Indebtedness" if a Triggering Event occurred before full payment. But even if a Triggering Event never occurred, JER could still collect the Deferred Indebtedness if the Debtor filed another voluntary bankruptcy case.[9] Thus, the Debtor's contention that the Deferred Indebtedness is not due under the terms of the Modification Agreements lacks merit.

---

[7] The statutory reference is obviously a typographical error. The Code does not include the referenced section.

[8] The Debtor has never maintained that it is not bound to the same extent as the Maryland Debtors by the Maryland Plan and Maryland Confirmation Order, or that the Modification Agreements differ materially from the Term Sheet.

[9] Although the Term Sheet defined a future bankruptcy filing as a "Default" while the Modification Agreements did not include it as a "Triggering Event," the effect on JER's collection rights was the same.

9

The remaining objections are foreclosed by the preclusive doctrines discussed above. The Debtor's objection ignores the legal effect of the prior bankruptcy, and views the treatment of the Deferred Indebtedness as wholly divorced from the confirmed Maryland Plan. Section 1127(b), however, would have barred the Debtor from confirming a plan in this case that altered the treatment of JER's claim granted under the Maryland Plan and Maryland Confirmation Order.[10] The current objection is an attempt to do through the back door what the front door forbids. The objection therefore violates the provisions of the Code that prevent the Debtor from modifying the confirmed Maryland Plan.

Furthermore, <u>res judicata</u> also bars the Debtor's objection. To determine if <u>res judicata</u> bars a later action, courts generally apply a four part test: (1) whether the prior decision was a final judgment on the merits, (2) whether the litigants were same parties, (3) whether the prior court was one of competent jurisdiction, and (4) whether the causes of action are the same. <u>Corbett</u>, 124 F.3d at 88; <u>In re Teltronics Servs., Inc.</u>, 762 F.2d 185, 190 (2d Cir. 1985). In the bankruptcy context, the court must also consider "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." <u>Corbett</u>, 124 F.3d at 88 (quoting <u>Sure-Snap</u>, 948 F.2d at 875-76). "This last inquiry may also be viewed as an aspect of the test for identity of the causes of action." <u>Corbett</u>, 124 F.3d at 88.

Here, all of the criteria are met. As already noted, a confirmed plan constitutes a final judgment on the merits. The Debtor is the successor-in-interest to the Maryland Debtors, and

---

[10] The parties have not discussed the status of the Maryland bankruptcy case. Given the passage of time, it is safe to assume that it has been substantially consummated.

under both New York and Maryland law, the "same parties" include "successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action." Watts v. Swiss Bank Corp., 265 N.E.2d 739, 743 (N.Y. 1970), accord Small v. Ciao Stables, Inc., 425 A.2d 1030, 1035 (Md. 1981) (citing Watts). Furthermore, the Maryland bankruptcy court had the authority to approve the parties' settlement and confirm the previous plan. Finally, the causes of action are the same. The Debtor's objection, if upheld, would impair JER's right to collect the Deferred Indebtedness – rights which the Maryland Debtors granted to resolve JER's objection to confirmation and secure its acceptance to the Maryland Plan.

Res judicata bars any challenge to the underlying allowance of the Deferred Indebtedness, or any claim that accrued and could have been raised in the earlier bankruptcy. Thus, the Debtor cannot argue that the Deferred Indebtedness is unenforceable as a penalty under non-bankruptcy law. If the Maryland Debtors thought that default interest, attorney's fees or expenses were not allowable, they should have pressed that objection in the Maryland case. The Maryland bankruptcy court allowed the claim for the Deferred Indebtedness when it approved the parties' compromise. More important, the Maryland Plan afforded JER the treatment that the Debtor now opposes in this case.

The same is true of the objections based on provisions of the Bankruptcy Code. For example, the Debtor argues that the Deferred Indebtedness provision is an ipso facto clause rendered unenforceable under 11 U.S.C. § 541(c)(1)(B).[11] Assuming without deciding that this

---

[11] Section 541 (c) (1) (B) provides:

11

section might otherwise apply, the right to assert the Deferred Indebtedness upon the filing of a bankruptcy petition was approved as part of the Maryland Plan to settle the parties' dispute. Under the Maryland Plan, the amounts that became the Deferred Indebtedness continued to be a lien on the Debtor's property, and the lien could only be discharged by full payment before an event of Default (under the Term Sheet) or a Triggering Event or bankruptcy filing (under the Modification Agreements). Furthermore, in the absence of the settlement, JER could have litigated its right to the immediate payment of all of the Deferred Indebtedness in the Maryland case, pressed its objection to confirmation and voted to reject the Maryland Plan.

Finally, the Debtor urges that ¶ 3.3 of the Modification Agreement creates an obligation triggered by the Debtor's bankruptcy filing that should be disallowed under 11 U.S.C. § 1124(2).[12] Section 1124(2) deals solely with the concept of impairment in the context of an

---

    (c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law –

    . . . .

 (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

[12]    Bankruptcy Code § 1124(2), in effect prior to the 2005 bankruptcy amendments, provided:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless with respect to each claim or interest of such class, the plan

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default - -

    (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

12

acceleration clause.  See In re 139-141 Owners Corp., 313 B.R. at 368.  The Debtor argues that JER's right to collect the Deferred Indebtedness arose due to an acceleration that occurred as a direct result of the Debtor's bankruptcy filing.  The Deferred Indebtedness did not, however, arise as a result of the bankruptcy filing.  The debt was due and deemed allowed as part of the Maryland bankruptcy case.  It was simply deferred based on contingencies that did not occur.

Lastly, In re Trans World Airlines, Inc., et al., 261 B.R. 103 (Bankr. D. Del. 2001), on which the Debtor places its principal reliance, is distinguishable.  There, TWA entered into an agreement with Karabu to sell airplane tickets at a steep discount. The agreement provided that if TWA filed a bankruptcy case, it would seek to assume the agreement, and waived the right to reject it.  The agreement became a plan document under a confirmed plan in an earlier, pre-packaged bankruptcy (TWA's second bankruptcy).

TWA filed a subsequent bankruptcy (its third), and moved to reject the agreement under 11 U.S.C. § 365 (a).  Karabu opposed the motion on several grounds, including judicial estoppel and res judicata.  Impelled by the overriding concern that the waiver of the right to reject a burdensome contract violated public policy, see id. at 118 ("TWA's prepetition agreement to waive its debtor-in-possession authority to assume or reject an executory contract under § 365 is

---

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest . . . for any actual pecuniary loss incurred by such holder as a result of such failure; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

13

contrary to the purpose of chapter 11 and is unenforceable"), the bankruptcy court concluded that neither judicial estoppel nor res judicata applied.  On the latter point, Judge Walsh found that Karabu's claim – the breach of the rejection waiver provision – did not arise until after the second bankruptcy, id. at 119-20, and the prior confirmation order was not a judgment on the merits of the enforceability of the agreement because the earlier bankruptcy court did not rely on it.  Id. at 120.

The facts in TWA stand in stark contrast to the present case.  Here, any objection to the allowance of the Deferred Indebtedness could have been and should have been raised in the Maryland bankruptcy case.  The Maryland Debtors did not object to the claim, and agreed to allow it, subject to a conditional waiver.  The Debtor in the present case did not waive anything.  Moreover, JER's conditional waiver, in contrast to the TWA waiver, did not violate any public policy.  Finally, the Maryland bankruptcy court expressly approved the settlement and allowed JER's claim in the Maryland Confirmation Order, and the compromise led JER to withdraw its objection and vote to accept the Plan.

**CONCLUSION**

For the reasons set forth above, the Debtor's motion is denied.  Settle Order.

Dated: New York, New York
       May 8, 2006

                                   /s/  *Stuart M. Bernstein*
                                   STUART M. BERNSTEIN
                                   Chief United States Bankruptcy Judge